```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
In re ADLER, COLEMAN CLEARING CORP., :
                                    :  97 Civ. 3817
                    Debtor.         :
                                    :
------------------------------------X
EDWIN B. MISHKIN, as SIPA Trustee for:
The Liquidation of the Business of  :
Adler, Coleman Clearing Corp.       :
                                    :
                    Plaintiff,      :
                                    :
        -  against  -               :  **DECISION AND ORDER**
                                    :
PHILIP GURIAN, TALLY GROUP, S.A.,   :
ROCENA COMPANY, LTD., UBIQUITY      :
HOLDINGS, LTD., A/K/A UMBIQUITY     :
HOLDINGS, S.A., MARAVAL AND         :
ASSOCIATES; CASPIAN CONSULTING, LTD.,:
and BAUMAN LTD.,                    :
                    Defendants.     :
------------------------------------X
```

**VICTOR MARRERO, United States District Judge.**

## I.   BACKGROUND

In an earlier proceeding in this matter, by Decision and Order dated November 8, 2005 (the "Order")[1] the Court granted the motion for summary judgment filed by plaintiff Edwin Mishkin, as Trustee (the "Trustee") for the liquidation of the business of Adler, Coleman Clearing Corp. ("Adler"). The Order, which provides a summary of the facts relevant to the matter now before the Court, determined that the Trustee was entitled to recover from defendant Philip Gurian ("Gurian") on

---

[1] The Decision and Order is reported as Mishkin v. Gurian (In re Adler, Coleman Clearing Corp.), 399 F. Supp. 2d 486 (S.D.N.Y. 2005); see also Jackson v. Mishkin (In re Adler Coleman Clearing Corp.), 263 B.R. 406 (S.D.N.Y. 2001).

two claims: under the common law alter ego doctrine and Section 20(a) ("§ 20(a)") of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78t(a), for payment of certain default judgments the Trustee had obtained against six Bahamian Companies (the "Bahamian Companies") named as defendants in the underlying case.  The Trustee also possessed a judgment by default against a seventh entity, Roddy DiPrimo, S.A. ("DiPrimo").  The Trustee charged in this case that all of these entities (collectively, the "Bahamian Entities") were sufficiently controlled by Gurian and used by him to commit massive securities fraud that eventually brought about Adler's financial collapse.

In establishing one of the elements of liability required under the Trustee's two theories -- Gurian's use of the controlled Bahamian Entities to commit the underlying fraud and primary securities violations -- the Court's summary judgment ruling relied in part on the default judgments entered against the Bahamian Companies (the "Bahamian Judgments") in actions brought by the Trustee alleging that those entities engaged in wrongful securities trading and other unlawful conduct that caused Adler's demise.  On Gurian's appeal of this Court's Order, the Court of Appeals for the Second Circuit vacated the judgment and remanded for further proceedings insofar as the Order had relied on the

Bahamian Judgments to support a finding that the prerequisite element of fraudulent misconduct had been satisfied as to the Trustee's two claims.   See Mishkin v. Gurian (In re Adler, Coleman Clearing Corp.), No. 05-6245-BK, 2006 WL 2374238 (2d Cir. Aug. 14, 2006).

In his supplemental motion for summary judgment now before the Court,[2] the Trustee seeks to establish Gurian's

---

[2]  By letter to the Court dated December 5, 2006, Gurian asserted that because the mandate of the Court of Appeals remanding this case was not issued until November 20, 2006, this Court lacked jurisdiction to conduct any proceedings prior to that date, including establishing the briefing schedule for the parties' submissions with regard to the instant motion, and that all the pre-mandate actions taken by the Court and the parties in this matter are null.  The Court rejects Gurian's categorical reading of the proposition he invokes that "jurisdiction follows the mandate." United States v. Rivera, 844 F.2d 916, 921 (2d Cir. 1988).  The Court does not construe that principle to be the inflexible, automatic and absolute rule Gurian would have it be.  The doctrine does not derive from any statutory prescription.  Rather, it is a judge-made rule grounded on practical concerns about judicial efficiency that seek to "avoid confusion or waste of time resulting from having the same issues before two courts at the same time."  United States v. Salerno, 868 F.2d 524, 540 (2d Cir. 1989); see also United States v. Rodgers, 101 F.3d 247, 251 (2d Cir. 1996), cert. denied, 520 U.S. 1188 (1997) ("Whatever the superficial attractiveness of a per se rule that filing a notice of appeal automatically divests the district court of jurisdiction ... such a rule is subject to abuse, and [its] application must be faithful to the principle of judicial economy from which it springs.")

Here, the Court of Appeals rendered its judgment remanding the case on August 14, 2006 and, in accordance with Fed. R. App. P. 41(b), its mandate was required to issue by September 5, 2006 -- seven calendar days after the time to file a petition for rehearing would have expired.  Thus, at the time the Trustee's motion was fully submitted on November 8, 2006, there were no substantive proceedings pending in the Circuit Court.  All that remained there was the clerk's ministerial function of actually entering the mandate.  Accordingly, when the mandate finally issued on November 20, 2006, the circumstances that warrant the rule did not exist. There was no meaningful risk of having "the same issues before two courts at the same time."  Salerno, 868 F.2d at 540.  Moreover, prior to the mandate this Court had issued no rulings on the merits of the dispute or otherwise that may have had a real potential to create confusion or waste of time as to any matter still under consideration at the Circuit Court. Accepting Gurian's rigid proposition would run counter to the judicial economy ends that the rule he invokes was fashioned to promote, and it would give license for the type of dogmatic formalism and abuse about which the Rogers court cautioned.

liability for the default judgment the Trustee had obtained on November 26, 1996 against DiPrimo (the "DiPrimo Judgment") from the Bankruptcy Court in Adler's liquidation proceeding. The Trustee here asserts that Gurian sufficiently controlled DiPrimo as well and used it to engage in the unlawful short selling of certain stocks (the "Hanover House Stocks") traded by Hanover Sterling & Company, Ltd. ("Hanover"), a securities firm that served as one of Adler's introducing brokers and whose financial failure ultimately resulted in Adler's liquidation.  According to the Trustee, Gurian was DiPrimo's alter ego and control person, and as such was responsible for DiPrimo's manipulative stock trading in violation of the federal securities laws that played a substantial role in Adler's losses.  Consequently, the Trustee maintains that Gurian may be rendered liable for the injury to Adler caused by DiPrimo's misconduct and for payment of the DiPrimo Judgment.

## II.   **STANDARD OF REVIEW**

In order to prevail on a motion for summary judgment, the moving party must demonstrate that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A motion for summary judgment should be granted unless the evidence adduced by the non-moving party is "sufficient ... for a jury to return a verdict for that party."  Id. at 249.

In determining whether genuine issues of material fact exist, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Once the moving party has made a showing that no genuine issue of material fact remains to be tried, the burden shifts.  In the face of a properly supported motion for summary judgment, the opposing party cannot "get to a jury without 'any significant probative evidence tending to support' [the existence of a disputed fact]."  Id. at 249 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 290 (1968)).  The nonmovant, however, cannot create a genuine issue of fact and defeat summary judgment through "[c]onclusory allegations, conjecture, and speculation."  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).  As the Second Circuit has recognized: "[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.  When

-5-

no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

### III.   DISCUSSION

A.   ALTER EGO DOCTRINE

The elements of the alter ego theory of liability, a doctrine designed to prevent corporate fraud, were articulated by the Second Circuit in Babbitt v. Vebeliunas (In re Vebeliunas), 332 F.3d 85 (2d Cir. 2003).  To warrant piercing the corporate veil under New York law[3] and thereby imposing liability on a person who effectively dominates or controls the vital affairs of a corporate entity, a plaintiff must establish that: "(1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or 'other wrong'; and (3) the fraud or wrong results in an unjust loss or injury to the plaintiff." Id. at 91-92 (citing Freeman v. Complex Computing Co., 119 F.3d 1044,

---

[3]  In its review of Gurian's appeal of this Court's earlier decision on this matter, the Second Circuit affirmed the application of New York law to resolve the issue of piercing the corporate veil.  See Mishkin, 2006 WL 2374238, at *1.

1052 (2d Cir. 1997) and Morris v. New York Dep't of Taxation & Fin., 623 N.E.2d 1157, 1060 (N.Y. 1993)) (quotation in original).  The Second Circuit also enunciated a number of criteria that weigh in evaluating the element of control.  Among the considerations listed, insofar as relevant to this action, are: (1) the absence of the formalities that constitute and manifest the corporate existence, for example, issuance of stock, election of directors, and keeping of corporate records; (2) the use of corporate funds deposited in or taken out of the corporation's accounts for personal rather than corporate purposes; (3) overlap in ownership, officers, directors, and personnel; (4) use of common office space, address and telephone numbers of corporate entities; (5) the extent to which the allegedly dominated corporation displayed business discretion; (6) whether the corporation in question had property that was used by the controlling person or corporation as if it were its own.  See id. at 90 n.3 (quoting Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991)).

In support of his motion, the Trustee asserts that, under Gurian's direction and control, DiPrimo engaged in various fraudulent schemes involving Hanover House Stocks that had the effect of putting Hanover out of business, which in turn caused Adler to fail.  DiPrimo's unlawful practices included

market manipulation by short selling Hanover House Stocks that DiPrimo did not own and thus could not deliver, and that was designed to defraud Hanover by artificially affecting the price of the securities, as well as extortion and employee raids that sought to bring about Hanover's demise.

1.  Control of DiPrimo

To establish his contention that Gurian controlled DiPrimo at all times relevant to this action, the Trustee presents statements made by Gurian constituting admissions of his connection to DiPrimo and of his control of its corporate activities for his own purposes.  This evidence consists of the following testimony.

First, during Gurian's criminal prosecution on charges of securities law violations Gurian stated, as part of the conspiracy he acknowledged during his plea allocution and to which he pled guilty, that he caused a Bahamian attorney to organize several Bahamian business companies, which included DiPrimo and five of the other Bahamian Entities, "for the benefit of the defendants [which included Gurian] in order to disguise and conceal the true owners and participants in various stock transactions as well as to defraud the investing public ... by disguising the fact that defendants participated in the sale of securities and profited by virtue of the sales." (See Transcript of Guilty Plea Before the Honorable

Mark Rizzo, United States Magistrate Judge, <u>United States v.</u> <u>Gurian</u>, No. 99-CR-215-T-23A, (M.D.Fla. 1999) (the "Gurian Criminal Case"), February 2000 ("Guilty Plea"), attached as Ex. F to the J.A. to the Initial Br. of Appellant Philip Gurian in <u>Miskhin v. Gurian</u>, No. 05-6245-BK (2d Cir. Mar. 21, 2006) ("App. Rec."), at 168.)

Second, in his plea agreement relating to various charges of conspiracy to commit securities fraud involving the initial public stock offering of SC&T International ("SC&T"), Gurian admitted that he caused the shares in question "to be issued to offshore accounts that Gurian controlled." (Plea Agreement entered in the Gurian Criminal Case (the "Plea Agreement"), attached as Ex. E. to App. Rec., at 132.)  The SC&T Prospectus for that offering, produced by the Trustee, indicates that DiPrimo was among six entities that purchased SC&T shares involved in the unlawful transaction Gurian described -- the same six entities specified in the indictment and Guilty Plea allocution in the Gurian Criminal Case. (<u>See</u> Prospectus, SC&T International, Inc., attached as Ex. M to the Affidavit of Sharon T. Hynes in Support of the Trustee's Supplemental Memorandum of Law in Support of Trustee's Motion for Summary Judgment, dated September 12, 2006 ("Hynes Aff."), at 31.)

Third, at a criminal trial at which he appeared as a cooperating witness called by the Government, Gurian testified

about the SC&T transaction.  There, he asserted that he and an associate, "through six foreign companies that I controlled," registered a portion of the SC&T shares. (See Transcript of Trial Before The Honorable Raymond J. Dearie, United States v. Nazareno, CR-98-1129(S) (E.D.N.Y. 1998) ("Nazareno Trial"), attached as Ex. O to App. Rec., at 515.)

Fourth, in a deposition given in this action, Gurian admitted that he and two associates controlled the operations of the Bahamian entities that were listed among the companies involved in the sale of the SC&T shares that comprised one of the securities fraud transactions to which Gurian pled guilty in the Gurian Criminal Case, and that he caused those Bahamian entities to open securities accounts whose trading he or one of his associates directed. (See Mishkin v. Gurian, No. 97 Civ. 3817 (S.D.N.Y. 1997), Deposition of Philip Gurian, Apr. 21, 2005 ("Gurian Dep."), attached as Ex. I to App. Rec., at 200-01 (48-49).)

Fifth, at a 1998 trial in Hong Kong arising from the sequence of events following Adler's collapse, Gurian admitted that he engaged in some "trading for Roddy DiPrimo for some period of time." (Transcript of the Trial of Hans Joerg Schneeberger, Criminal Case No. 1163 of 1997 (the "Hong Kong Trial"), attached as Ex. J to App. Rec., at 377 (M-0)).  In his deposition taken for this case, Gurian was asked about

-10-

that aspect of his Hong Kong Trial testimony and stated that
he didn't remember, but that he "believe[d] it to be true."
(Gurian Dep., App. Rec. at 221 (131:8-9), 222 (133:3-13).)

Next, the Trustee presents statements by Brian Graifman
("Graifman") and John Wall ("Wall"), two attorneys who
represented DiPrimo in litigation (the "DiPrimo Action") that
the company commenced against the Trustee during the
Bankruptcy Court proceedings on Adler's liquidation, which
resulted in a judgment in favor of the Trustee. (See In re
John Fiero, No. CAF 980002, 2002 WL 31476976 (N.A.S.D.R. Oct.
28, 2002).) Graifman testified that early in the course of
the DiPrimo Action he spoke on the telephone with Gurian,
together with John Saunders ("Saunders"), one of the persons
Graifman identified as having been designated to communicate
on behalf of DiPrimo for the purpose of the litigation. (See
Deposition of Brian D. Graifman, November 14, 1996, attached
as Ex. K to App. Rec., at 404 (58:3-9), 408 (75:13-25), 409
(78:3-15).) According to Graifman, during one of the early
conversations "[Gurian] was on with Johne [sic] Saunders and
informing him of what was going on with the litigation." (Id.
at 409 (78:6-8).) Subsequently, when Graifman was ordered by
the Bankruptcy Court to answer questions by deposition about
his representation of DiPrimo and the persons with whom he
dealt in the client relationship, Graifman stated that Gurian

-11-

was one of the people with whom he consulted about his response on five to seven or more occasions. (See id. at 409 (81:10-13).) Graifman was later replaced as DiPrimo's counsel by Wall, who also withdrew. In seeking leave to withdraw, Wall submitted an affidavit to the Bankruptcy Court in which he listed Gurian as a representative of DiPrimo. All of the other contacts identified apparently were DiPrimo's various other attorneys in the proceeding.

Questioned in a deposition in 1996 about his alleged control of DiPrimo, his direction of DiPrimo's short trading in the Hanover House Stocks, and DiPrimo's inability to cover its short positions, Gurian refused to answer, instead invoking his privilege against self-incrimination. (See Deposition of Philip Gurian on November 5, 1996, attached as Ex. H to Hynes Aff., at 14:17 - 16:8.) In his deposition in this action, although acknowledging that he was aware of the DiPrimo's litigation with the Trustee, Gurian responded, "I don't know" when asked whether he ever had any conversations or correspondence with Graifman in this regard, and stated that he did not recall whether he had any involvement with DiPrimo in that litigation. (See Gurian Dep., App. Rec. at 222 (135:4-14).) Yet, one year later, in his affidavit filed in opposition to the instant motion, he categorically swore that he had no involvement in the DiPrimo litigation. (See

Affidavit of Philip Gurian dated October 2006 (the "Gurian Aff."), attached as Ex. 5 to Affidavit of Katherine Earle Yanes ("Yanes Aff."), dated October 16, 2006, ¶ 4.)

Gurian's denials are insufficient to raise an issue of fact when they are inconsistent with prior sworn testimony. See Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997) ("[W]e follow the rule that 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'") (quoting Hayes v. New York City Dep't of Corrections, 84 F.3d 614, 619 (2d Cir. 1996)); see also Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) (the Fifth Amendment "does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); LiButti v. United States, 107 F.3d 110, 121 (2d Cir. 1997).

On the basis of the record before it in its entirety, the Court finds the evidence sufficiently compelling to support a finding that the Trustee has made out a prima facie case with regard to the issue of Gurian's control of DiPrimo.

At this point the burden shifts to Gurian to present enough concrete competent evidence to establish the existence of any genuine dispute as to a material fact. See Anderson,

-13-

477 U.S. at 249; <u>Rexnord Hldgs., Inc. v. Bidermann</u>, 21 F.3d
522, 525 (2d Cir. 1994).   His response fails to do so.[4]
First, Gurian submits his own affidavit in which he either
directly contradicts his sworn testimony in three prior
judicial proceedings, or he fails to offer a plausible
explanation of those earlier statements that would that now
raise an issue of material fact, or else he ignores his
inconsistencies altogether.  Specifically, Gurian's affidavit
categorically asserts that during the relevant timeframe he
did not own or control DiPrimo, or participate in any
decisions regarding the ordering or execution of trades on its
behalf, or profit from any such transactions.  (<u>See</u> Gurian
Aff., ¶¶ 1, 2, 3.)   Gurian states that any conversations he

_____

[4] By letter to the Court dated November 7, 2006, after the Trustee's reply
had been filed in this proceeding and the motion was thus fully briefed,
Gurian requested that the Court stay consideration of the motion for 14
days to allow Gurian additional time to review certain documents and file
supplemental exhibits that he felt might further support opposition to the
instant motion.  The Court denied the request by memo-endorsed Order dated
November 8, 2001 taking account, among other considerations, the
following: the exceptionally lengthy time and opportunity that Gurian has
had to review the record of the case and respond to the motion, including
the Court's granting him a 30-day extension to submit opposition as well
as authorization to submit a brief 15 pages in excess of the ordinary
limitation; the closing of the record of discovery relating to this motion
many months ago; the numerous prior instances in which the Court expressed
concern about Gurian's repeated attempts to delay or frustrate
adjudication of this case by various dilatory tactics; and the speculative
quality of the request for additional material that may or may not exist
and may or may not be supportive.  Nonetheless, without further addressing
the Court's November 8, 2006 Order, Gurian proceeded on November 16, 2006
to file directly with the Clerk of Court a set of documents for entry into
the docket of the case, which he then asked the Court to consider.  The
Court, having viewed the submission as an express violation of the
November 8, 2006 Order, declined to accept these documents for filing or
consideration and so informed the parties by means of a telephone
conference on November 16, 2006 and by memo-endorsed Order dated December
4, 2006.

-14-

had with DiPrimo's attorneys were on his behalf, and not
DiPrimo's. (See id. ¶ 4.) He does not explain, however, what
particular separate matters of his own he was engaged in with
DiPrimo's attorneys that demanded his discussions with them at
that time.

The Court finds these responses insufficient to raise a
genuine triable issue on the point regarding Gurian's control
of DiPrimo.  Gurian's Guilty Plea unequivocally admitting as
an aspect of the underlying offense that he controlled six
Bahamian entities, which the allocution leaves no room for
doubt included DiPrimo, estops him from later denying that
fundamental fact.  See Cleveland v. Policy Mgmt. Sys. Corp.,
526 U.S. 795, 806 (1999) (noting that a party cannot create a
genuine issue of fact sufficient to survive summary judgment
simply by "contradicting his or her own sworn statement [ ] by
... affidavit that flatly contradicts that party's earlier
sworn deposition");  Bickerstaff v. Vassar Coll., 196 F.3d
435, 455 (2d Cir. 1999).

In view of these irreconcilable conflicts in Gurian's
testimony, for which he offers no plausible explanation and on
which he substantially relies to create a genuine issue of
material fact in opposing summary judgment, the Court is
persuaded that no rational trier of fact could reasonably find
for Gurian.  See Matsushita Elect. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1987); see also Jeffreys v. City of
New York, 426 F.3d 549, 551 (2d Cir. 2005) (noting that no
genuine issue is raised and summary judgment is appropriate
where a party's allegations are "'so replete with
inconsistencies and improbabilities' that no reasonable juror
would undertake the suspension of disbelief necessary to
credit" the statements in question.) (quoting Jeffreys v.
Rossi, 275 F. Supp. 2d, 463, 475 (S.D.N.Y. 2003)).

Responding to the Trustee's references to his numerous
admissions concerning his control of DiPrimo, Gurian seeks to
explain away his prior statements by attributing them to the
"confusing way" he lumped DiPrimo among the "loosely-defined
term 'Bahamian Entities.'" (Defendant Gurian's Response to
Plaintiff's Motion for Summary Judgment, dated October 16,
2006, at 14.)  He asserts that while he did admit in the
deposition he gave in connection with this action that he had
an ownership interest in the co-defendant Bahamian Companies,
in context when asked whether he controlled the Bahamian
entities and he answered that he and his co-owners "all
controlled them," Gurian was really referring to the six
companies, and not DiPrimo.  (Id.)  He points out that in fact
he testified that DiPrimo was owned by Fiero.

Gurian's reference to his prior testimony regarding the
ownership of DiPrimo is similarly insufficient to raise a

-16-

genuine issue for trial.  First, as the Trustee points out,
the complaint in this action is unambiguous in enumerating the
Bahamian entities the Trustee alleged Gurian controlled to
specifically include DiPrimo.  (See Amended Complaint ¶¶ 114-
21, 188-90, attached as Ex. C to App. Rec., at 49-50, 71.)
Second, during the allocution of his Guilty Plea, the list of
the Bahamian entities that the court read that were alleged
to have been part of the conspiracy, and that Gurian was
charged with having organized "for the benefit of the
defendants in order to disguise and conceal the true owners
... as well as to defraud the investing public," specifically
included DiPrimo.  (See Guilty Plea (36:15-23), App. Rec. at
168 (emphasis added).)

Third, Gurian attempts to sidestep the real question at
issue here and his related admissions in this regard -- his
control of DiPrimo -- by focusing on what he had stated about
the ownership of DiPrimo.  But, as this Court observed in
previously addressing the same issue, actual ownership is not
a prerequisite to a finding of liability under the alter ego
or control person doctrine.  See Mishkin, 399 F. Supp. 2d at
494 (noting that to pierce the corporate veil under New York
law, courts apply the doctrine of equitable ownership
according to which "an individual who exercises sufficient
control over the corporation may be deemed an 'equitable

owner' notwithstanding the fact that the individual is not a shareholder of the corporation.") (citations omitted).

Gurian also attempts to raise a factual dispute regarding his control of the DiPrimo litigation by means of an affidavit from Graifman.  In it, Graifman offers merely a conclusory or speculative opinion that the Trustee's contention that Gurian controlled DiPrimo's litigation "is not determinable from my deposition nor from my recollection."  (Affidavit of Brian Graifman, dated October 6, 2006, attached as Ex. 7 to Yanes Aff., ¶ 1.)  Graifman states that he received instructions regarding the DiPrimo Action from the Bahamian attorney who was the company's registered agent and from two individuals he identified as Saunders and Peter Franklin, and not from Gurian.  (See id. ¶ 2.)  He also confirms, however, that in one or more of his conversations with Saunders, Gurian participated in the call in discussions about what was going on with the litigation.  (See id. ¶ 3.)  Moreover, while Graifman asserts that he failed to inquire about what part Gurian played in these discussions, he adds a telling statement that embodies implicit reference to the very question at issue in the instant proceeding.  Specifically, explaining why he did not ascertain the reason for Gurian's involvement in the conversations with Saunders, Graifman asserted: "As there seemed to be an issue brewing as to who

-18-

owned or controlled Roddy DiPrimo, I believe I leaned towards a don't ask, don't tell approach."  (Id. ¶ 4.)

Graifman's efforts to explain his earlier testimony or to establish a genuine issue through his somewhat ambiguous, argumentative statement are no more availing than Gurian's similar attempts in this regard.  The Court is not persuaded that, viewing the record as a whole, even in the light most favorable to Gurian, the evidence Gurian proffers is sufficient to raise a triable issue with regard to his control of DiPrimo.  At best, Graifman's testimony may be viewed as presenting nothing more than a "scintilla of evidence" as to one issue that, when assessed in relation to the totality of the record, is insufficient support a verdict by a rational factfinder in Gurian's favor.  See Anderson, 477 U.S. at 252; see also Gibson v. American Broadcasting Co., 892 F.2d 1128, 1132 (2d Cir. 1989) ("The possibility that a material issue of fact may exist does not suffice to defeat [a summary judgment] motion; ... the party opposing it must set forth arguments or facts to indicate that a genuine issue -- not merely one that is colorable -- of material fact is present.")

Gurian has not only failed to overcome his sworn admissions that he created DiPrimo and the other Bahamian Entities for his own benefit and that he controlled the corporations, he has not met his burden to produce any other

-19-

concrete evidence necessary to rebut the Trustee's prima facie case as it relates to the alter ego and control person criteria articulated in Babbitt.  For example, he has offered no tangible evidence from DiPrimo's own official records -- such as adoption of bylaws, minutes of meetings of the board of directors or shareholders, identities of officers, employees or corporate offices, payroll records, or filing of tax returns -- documenting that in fact DiPrimo existed in corporate form, that it existed for the conduct of legitimate business, and that it adhered to legal and business formalities.  See JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 386 F. Supp. 2d 461, 473 (S.D.N.Y. 2005).  Indeed, Gurian acknowledges that DiPrimo, like the other Bahamian Entities he admits he controlled, used the same post office box number as its corporate address and was located in the office of the entities' Bahamian local counsel who incorporated them.  (See Gurian Dep., App. Rec. at 205 (67-68).)

Gurian's response that DiPrimo was adequately capitalized because it had initial funding of $1 million in its brokerage account fails to address the Trustee's evidence regarding the amounts, discussed below, far exceeding that sum by which DiPrimo engaged in short selling the Hanover House Stock.  Nor does Gurian present concrete evidence sufficient to raise an

issue of fact concerning his commingling of personal and corporate funds, as evidenced by the Trustee's documentation establishing that Gurian sought and obtained permission from the sentencing court in the Gurian Criminal Case so as to enable him to withdraw for personal use assets in the form of particular shares of stock held in accounts in the names of the Bahamian entities he admitted he controlled, including DiPrimo. (See Gurian Criminal Case, Motion to Release Assets, attached as Ex. G to App. Rec.)   Moreover, those same entities, as the Trustee pointed out and Gurian does not address, guaranteed DiPrimo's debts in connection with the SC&T transaction in April 1995.

      2.   <u>DiPrimo's Frauds and Other Wrongful Acts</u>

The Trustee's complaint in this action charged that Gurian, through his control and direction of DiPrimo, engaged in a scheme of deception and market manipulation of Hanover House Stocks involving concerted naked short selling of those securities, extortion and raids of Hanover employees, all such wrongful conduct having had the effect of driving Hanover, and ultimately Adler, out of business.   Those transactions involved the sale of stocks that the sellers did not own and thus could not deliver.   In the instant motion, to establish DiPrimo's unlawful manipulation of the Hanover House Stocks, the Trustee relies upon DiPrimo's trading records and

admissions it made in judicial pleadings, as well as sworn testimony of Gurian himself. According to the Trustee, this evidence is sufficient to establish DiPrimo's concerted, naked short selling and related extortion scheme that harmed Hanover and Adler.

The admissions the Trustee described are contained in pleadings in the Bankruptcy Court action that DiPrimo instituted against the Trustee challenging the Trustee's forced buy-in of Hanover House Stocks. In its complaint in that proceeding DiPrimo asserted that as of January 19, 1995 it had executed net-settled short positions in certain Hanover House Stocks but that, in order to make delivery on its short sales, it was not able to acquire the securities from any other source except the Trustee, who had purchased the outstanding Hanover House Stocks in the buy-in. (See Complaint, Roddy DiPrimo, SA v. Mishkin, No. 95-8203 (JLG), Adv. Proc. No. 95/1237A ("DiPrimo Compl.") ¶¶ 9, 17, attached as Ex. A to Hynes Aff., at 22-23.)

The Trustee contends that DiPrimo's account statements confirm the company's short selling as well as the amounts of its positions in the Hanover House Stocks that were transacted for the purpose of driving down the price of the securities, and establish that the trading substantially exceeded the approximately $2.3 million DiPrimo acknowledged in the

Bankruptcy Court action -- in fact amounting to more than $7.5 million for a total of 484,000 shares of various securities. (See Trustee Mem. at 9.)  Moreover, the Trustee contends that the trading records demonstrate that DiPrimo was one of a number of short sellers participating in massive, concerted trading in the Hanover House Stocks that occurred shortly before Hanover was shut down and created pressure driving down the price of the shares.  Gurian subsequently entered into an agreement to end the short selling in exchange for Hanover's commitment to sell its stocks to the short sellers' group at prices below the market so as to enable them to cover their positions and thereby to make a substantial profit.  This arrangement is confirmed by Gurian's own statements.  In his deposition in this action he acknowledged his understanding that if Hanover would sell house stocks below market prices to Gurian and other traders he knew were short selling the securities, the short selling would stop; that the short sellers purchased the shares and soon thereafter started shorting the stocks again. (See Gurian Dep., App. Rec. at 250 (246:6-18), 252 (250:5-20).)  In this connection, Gurian admitted that he realized a net gain of about half a million dollars from the scheme, a sum which the Trustee points out corresponds to the profit DiPrimo's trading records indicate it earned from those transactions.  (See Trustee Mem. at 9-

-23-

10.)

Gurian conceded in testimony at the Nazareno Trial that during that time he had conversations with John Moran, who was brought in by Hanover in an attempt to stop the short selling by Gurian and other traders, and that their discussions were about the short selling and its effect on Hanover. (See Tr. of Nazareno Trial, App. Rec. at 532 (2204:8-16); Deposition of John T. Moran, January 30, 1996 ("Moran Dep."), attached as Ex. P to App. Rec., at 654 (199:7-18), 655 (200:4-24).) Gurian admitted in his deposition as well that he reached an understanding with Roy Ageloff of Hanover under which Hanover would sell its stocks to Fiero at prices below the market, Fiero would distributed them to Gurian and other short sellers, and "that would stop the short selling." (Gurian Dep., App. Rec. at 251 (249:1 - 250:10).) Gurian also acknowledged that, aware that Hanover's collapse was imminent, he urged a Hanover broker to transfer accounts to another firm, knowing that the effect of that departure would be to trigger a massive sell-off of their Hanover stocks, from which Gurian stood to profit. (See Tr. of Nazareno Trial, App. Rec. at 502-03 (2174:19 - 2175:6).)

Gurian's testimony regarding the extortion scheme is corroborated by Moran, who testified that he was used by Hanover as the middleman because he knew Gurian; that it was

Gurian who told him that the group of short sellers would stop trading in the Hanover House Stocks if they were paid two to three million dollars in extortion money; and that Gurian's purpose in engaging in the scheme was to reap a substantial gain, despite Moran's entreaties that the short selling threatened to put Hanover out of business. (See Moran Dep., App. Rec. at 624-26.)

In response to the evidence the Trustee submits to make out a prima facie case, Gurian contends that DiPrimo's admissions cannot be attributed to Gurian, that no adverse inferences may be drawn against DiPrimo or Gurian, and that the findings of the disciplinary action brought by the National Association of Securities Dealers against Fiero do not constitute evidence admissible against Gurian.  He does not dispute the amounts documented by the trading records of DiPrimo's short sales of Hanover House Stocks during January and February 1995,[5] asserting only that the numbers are misleading and do not establish that the sales were necessarily naked.  He counters Moran's testimony essentially by a dismissive and conclusory denial declaring simply that

---

[5]  In his opposition to the motion, Gurian sought to minimize the amount of DiPrimo's short sales of the Hanover House Stocks by submitting trading records indicating that the DiPrimo's positions in the Hanover securities were substantially less than the Trustee claimed.  In reply, the Trustee pointed out that Gurian's documentation unexplainably omitted trades made but not settled before Hanover was closed down.  In a subsequent letter to the Court dated November 9, 2006 Gurian admitted that the error in his documentation and analysis misrepresented the timing and thus the actual amounts of DiPrimo's trading in the Hanover House Stocks.

"[t]here was no extortion," and he asserts that Moran's testimony does not sufficiently establish that such a scheme existed.  (Gurian Mem. at 29.)  He contends that there is no evidence that Gurian or DiPrimo engaged in any trading of Hanover House Stocks with the scienter necessary to establish a violation of § 10(b) of the Exchange Act ("§10(b)") and Rule 10b-5 ("Rule 10b-5"), promulgated thereunder.  Further, he argues that the Trustee has not satisfied the loss causation requirement necessary to prove Adler's injury under Rule 10b-5, or that Adler's loss was caused by Gurian or DiPrimo.  Gurian maintains that in fact Hanover and Adler would have failed by reason of their own actions regardless of any trading by DiPrimo.

The Court is not persuaded that Gurian's response satisfies his burden to raise a genuine issue of material fact sufficient to defeat summary judgment for the Trustee as to these questions.  Rather than presenting competent evidence to rebut the Trustee's case, Gurian offers little more than his own affidavit, which fails to explain the myriad contradictions with his own prior testimony under oath, and various conclusory arguments grounded more on polemics than on hard evidence demonstrating the existence of triable disputes as to material fact.  Gurian's arguments that various admissions made by DiPrimo and other evidence of DiPrimo's

-26-

conduct are not admissible against Gurian ignores the
predicates of the Trustee's case: that the evidence
establishes that Gurian exercised sufficient control over
DiPrimo, and that DiPrimo consequently served as Gurian's
agent in connection with the unlawful conduct in which DiPrimo
engaged. Accordingly, DiPrimo's relevant actions and
statements, as well as any reasonable inferences that may be
drawn from that conduct, are admissible against Gurian
pursuant to Fed. R. Evid. 801(d)(2)(D). See Pappas v. Middle
Earth Condo. Ass'n, 963 F.2d 534, 537-38 (2d Cir. 1992). Nor
does Gurian concretely explain his new-found memory to claim
in his recent affidavit that he answered every question posed
to him at his earlier deposition, and to flatly deny essential
matters about which he refused to testify at the time the
facts must have been fresh in his mind, or that on prior
occasions he swore he did not recall. Under these
circumstances, the Court may properly disregard the statements
in Gurian's affidavit as a basis for creating a genuine
dispute about material facts. See Raskin, 125 F.3d at 63.

With regard to the extortion scheme, while Gurian seeks
to dismiss or discredit the testimony of Moran as unreliable
and not probative of the scheme, he ignores that the critical
value of Moran's testimony is that it effectively
substantiates Gurian's own sworn trial testimony, discussed

-27-

above, about his motive, participation and leading role in the scheme as part of a group of traders, and about the otherwise unaccountable profit he personally derived from it.

The Court is persuaded that the evidence sufficiently establishes that DiPrimo's conduct, under Gurian's control, amounted to concerted, naked short selling whose purpose was to drive down the price of Hanover House Stocks, especially when combined with insufficiently rebutted evidence of the existence and effects of the extortion scheme and employee raids on Hanover. Such collusive and manipulative acts constitute violations of § 10(b) and Rule 10b-5. See United States v. Peltz, 433 F.2d 48, 53 (2d Cir. 1970), cert. denied, 401 U.S. 955 (1971) (affirming a conviction on charges that short sales of stocks defendant represented he owned which in fact he did not own and was unable to deliver on settlement date constituted criminal violation of § 10(b)); Jackson (In re Adler Coleman Clearing Corp.), 263 B.R. at 418-19; In re John Fiero, Comp. No. CAF980002, 2002 WL 31476976, at *10-11, *18 (N.A.S.D.R. Oct. 28, 2002). Such wrongful conduct is also sufficient to satisfy the second element of the prerequisites for piercing the corporate veil and holding Gurian liable for DiPrimo's debts. See International Controls Corp. v. Vesco, 490 F.2d 1334, 1350 (2d Cir. 1974), cert. denied, 417 U.S. 932 (1974).

3.   <u>Scienter and Loss to Adler</u>

Contrary to Gurian's contention, on this record the scienter requirement to establish a § 10(b) violation is satisfied.  The Trustee has sufficiently demonstrated Gurian's knowledge of or reckless participation in the manipulative scheme involving the concerted short selling of the Hanover House Stocks, and the extortion scheme intended to lower the price of the securities and ultimately to cause Hanover's collapse.  As discussed above, setting aside the contradictory assertions in the Gurian Affidavit, the Court is persuaded that Gurian has not presented sufficient evidence to raise a genuine issue of material fact countering his own prior statements, which were given under oath before a judge and subject to cross-examination, and which were corroborated by the sworn testimony of Moran.  This evidence confirms that Gurian and the other short sellers could not deliver the Hanover House Stocks and participated in and profited from the extortion scheme in order to cover their trades, and in exchange for ending the short selling, which they subsequently resumed.  This misconduct is sufficient to demonstrate the necessary knowledge or recklessness component of a § 10(b) violation.  <u>See</u> <u>Fiero</u>, 2002 WL 31476976, at *19.

Similarly, with regard to loss causation, Gurian argues that it has not been shown here that a sufficient connection

-29-

existed between DiPrimo's trading in the Hanover House Stocks and Adler's injuries.    The Court disagrees.    Market manipulation by means of concerted short selling calculated to artificially bring down the price of stocks constitutes harmful conduct sufficient to establish loss causation.  See Compudyne Corp. v. Shane, 453 F. Supp. 2d 807, 827 (S.D.N.Y. 2006).   The Trustee has demonstrated that DiPrimo's short sales positions in Hanover House Stocks just prior to Hanover's demise exceeded $7.5 million, an amount that Gurian apparently does not dispute[6] and that the Fiero court observed was "sizeable," 2002 WL 31476976, at *12 -- not counting the sales of the other traders with whom Gurian acknowledged he had engaged in the short selling.  The pressure that the short sellers' collusive manipulation placed on the price of the Hanover House Stocks forced the firm to expend its limited capital to purchase its own securities in order to support their value, eventually bringing about Hanover's downfall, and shortly  thereafter  Adler's  as  well.   The  evidence  and arguments Gurian presents to address the loss causation element do not suffice to raise a triable issue of material fact as to the proximate connection between DiPrimo's and Gurian's wrongful conduct and the collapse of Hanover and Adler.

---

[6]  See footnote 5 and accompanying text above.

On the record before it, the Court therefore concludes that, viewing the evidence in its entirety, no rational jury could render a verdict in favor of Gurian on the issue of alter ego liability.

B.  SECTION 20(a) LIABILITY

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (2005).

In Securities and Exchange Commission v. First Jersey Sec., Inc., 101 F.3d 1450 (2d. Cir. 1996), the Second Circuit enunciated the elements of a prima facie case of Section 20(a) controlling-person liability.  For this purpose, a plaintiff must show "[1] a primary violation by the controlled person ... [2] control of the primary violator by the targeted defendant and ... [3] that the controlling person was 'in some meaningful sense [a] culpable participant[ ] in the fraud perpetrated by [the] controlled person[ ].'"  Id. at 1472 (internal citations omitted).  Control over a primary violator may be demonstrated by evidence showing that "the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the

-31-

ownership of voting securities, by contract, <u>or otherwise</u>.'" <u>Id.</u> at 1472-73 (<u>quoting</u> 17 C.F.R. § 240.12b-2) (emphasis added).

On the record before it, the Court finds that the Trustee has sufficiently established the preceding elements in this case. The Court finds that the primary violations by DiPrimo and Gurian's control of that entity has been sufficiently demonstrated by the same evidence cited by the Trustee and relied upon by the Court as satisfying the standards for alter ego liability described above.   That evidence is drawn primarily from Gurian's own unrefuted sworn testimony in the Guilty Plea, the Plea Agreement, the Nazareno Trial, the Hong Kong Trial and the Gurian Deposition, and substantiated by other overwhelming evidence in the record discussed above.

Finally, the evidence of Gurian's culpable participation in the fraudulent scheme of which DiPrimo was the primary violator, though as mere instrument of Gurian's unlawful activities, is also amply manifested in Gurian's Guilty Plea, the Plea Agreement, the Nazareno and Hong Kong Trials, the Gurian Deposition and other sworn testimony cited above. Read together, these documents sufficiently demonstrate Gurian's use of DiPrimo to engage in market manipulation through fraudulent short sales of Hanover House Stocks, as well as in extortion intended to drive down the prices of the Hanover House Stocks, from which Gurian profited.   As this Court

previously observed in reviewing this evidence: "It is hard to imagine a clearer example of culpable participation in unlawful transactions than the offender pleading guilty to underlying crimes arising out of those activities." <u>Mishkin</u>, 399 F. Supp. 2d at 494.

On the evidence before it, the Court therefore concludes that Gurian was a controlling person of DiPrimo for the purposes of Section 20(a) liability, and may thus be held liable to the Trustee for DiPrimo primary violation of § 10(b).

## IV.   <u>DAMAGES</u>

To establish the damages Adler suffered as a result of DiPrimo's unlawful conduct, the Trustee submits a report prepared in November, 1996 by John P. Norris of Peterson Consulting LLC (the "Norris Report"). The Norris Report employed two methods to calculate Adler's losses attributed to Hanover's collapse under the market pressures of the short selling of Hanover House Stocks in late February 1995. The first analysis was based on expenses and liabilities that the Adler estate incurred by reason of being driven out of business. The second evaluation examined and tallied various major claims made against the Adler estate arising from Adler's demise. Under both calculations the Norris Report concluded that a conservative estimate of Adler's losses exceeded approximately $50 million. (<u>See</u> Declaration of John

-33-

P. Norris in Support of an Order Entering Judgment Against Roddy DiPrimo, S.A., dated November 18, 1996, attached as Ex. R to Hynes Aff., ¶¶ 4, 10, 15.)  The Trustee thus seeks a judgment of $50 million against Gurian in this action as damages attributable to Gurian under § 20(a) for using his control of DiPrimo to commit fraud in violation of the federal securities laws.

In addition, the Trustee seeks an order holding Gurian liable as a control person under the alter ego doctrine for payment of the Trustee's judgment against DiPrimo stemming from the Trustee's counterclaims in the DiPrimo Action.  That judgment awarded the Trustee $50 million on claims asserting violations by DiPrimo of the securities laws, fraudulent transfers under the Bankruptcy Code and common law fraud and deceit, as well as $150 million for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 et seq.

Gurian presents no expert analysis challenging the methods or results presented in the Norris Report.  Instead, he argues in response that the $50 million figure cannot be used as a basis for damages here because it derives from a proceeding in which Gurian was not a party and because the Trustee has not quantified the amount of Adler's losses attributable to Gurian's alleged use of DiPrimo.  Moreover, Gurian contends that the Trustee is not entitled to judgment

of $150 million on the RICO violations on the ground that such an award would improperly rely on DiPrimo's default in the DiPrimo Action to determine damages, and that the Trustee has not specifically established that Gurian used DiPrimo to violate RICO.  He points out that the Trustee's theory of DiPrimo's primary liability in the case at hand was based on violations of § 10(b) and Rule 10b-5, and not on RICO claims. The Court is not persuaded by these arguments, and concludes that Gurian has failed to raise a genuine issue of material fact concerning the damages the Trustee claims.

First, the Court has examined the Norris Report and finds that its methodology and calculations constitute appropriate means for calculating the damages incurred by the Adler estate as a consequence of Hanover's failure.  The Court relies on its own assessment of the accuracy and reliability of this expert analysis, combined with the conclusions reached above in determining that the Trustee has provided sufficient independent and uncontroverted evidence to establish a primary violation by DiPrimo of § 10(b) and Rule 10b-5, as well as the resulting losses. Hence, the Court's ruling does not rest on the DiPrimo Judgment to determine an appropriate amount of damages the Trustee is entitled to recover on account of DiPrimo's securities violations.  A reasonable computation of Adler's losses flowing from Hanover's demise is thus separately and adequately quantified.  Pursuant to § 20(a),

Gurian's control person liability is joint and several and to the same extent as DiPrimo's.  See 15 U.S.C. § 78t(a). Because the evidence also sufficiently demonstrates no genuine issue of material fact that in using DiPrimo to engage in the manipulative short selling of Hanover House Stocks and in the related extortion scheme Gurian acted in concert with other traders, the Trustee need not further identify and quantify, as Gurian suggests, any portion of Adler's losses specifically caused by Gurian's use of DiPrimo.  In fact, DiPrimo's liability to Adler and thus Gurian's, is also joint and several with any other such traders whose liability for the same conduct has been established, and would be offset by any amount of the same damages that the Trustee may have recovered from those wrongdoers.

Second, with regard to Gurian's liability for payment of the DiPrimo Judgment, the Trustee has indisputably established by means of the instant motion, through sufficient evidence not dependent on the DiPrimo Judgment, that Gurian controlled DiPrimo for the purpose of liability under § 20(b) and the alter ego doctrine.  To impose alter ego liability on Gurian, all that is required is evidence of Gurian's use of his control of DiPrimo "to commit a fraud or 'other wrong.'" Babbitt, 332 F.3d at 91-92.  The Trustee has met this burden. As discussed above, on the record before the Court, no rational trier of fact would find that the Trustee has not

adequately established, as he charges here, that Gurian, through his control of DiPrimo, committed fraud or other wrong in connection with his manipulative short selling of the Hanover House Stocks and related extortion of Hanover, and thus rule for Gurian.

Because he was DiPrimo's control person, Gurian's rights and liabilities are coextensive with DiPrimo's. The determination that DiPrimo served as Gurian's alter ego in these transactions is sufficient to entitle the Trustee to enforce against Gurian any obligations DiPrimo owed the Trustee, including judgments awarded to the Trustee against DiPrimo. See JSC Foreign Econ., 386 F. Supp. 2d at 479. The alter ego obligations would also encompass liability of the controlling person for a judgment entered against DiPrimo by default. See International Controls Corp. v. Vesco, 535 F.2d 742 (2d Cir. 1976); Gerber Trade Fin. Inc. v. J.A.D.E. Fisheries, Inc., 2004 WL 626183, *4 (S.D.N.Y. 2004). By its terms, a default judgment embodies a finding of liability for the unlawful conduct at issue, and does not entitle the party against whom it is properly claimed to reopen the merits of the dispute the judgment resolves, absent special circumstances not present here. See In re Chalasani, 92 F.3d 1300, 1307-08 (2d Cir. 1996). A default judgment creditor is not required to relitigate the substantive grounds for the underlying liability of an alter ego when the obligation for

-37-

the judgment is sought to be imposed on the debtor's control person, to any greater degree than if the enforcement of that judgment were sought directly against the controlled entity. See In re Teltronics Services, Inc., 762 F.2d 185, 191 (2d Cir. 1985). As DiPrimo's control person, Gurian had the ability to contest the entry of judgment by default against DiPrimo in 1996. He chose not to do so and should not now be able to reopen those issues in this proceeding. It would be incongruous indeed if a control person were allowed to challenge imposition of liability upon him for a judgment entered by default against his alter ego -- a result that the controlling person had the ability to contest and was in the best position to avert -- on the ground that the merits of the claims at issue were never fully litigated. See United States Sec. & Futures Corp. v. Irvine, No. 00 Civ. 2322, 2002 U.S. Dist. LEXIS 26165, at *12 (S.D.N.Y. May 10, 2002) (noting that a person who exercises control over an entity and could have prevented a default judgment by producing evidence or otherwise responding to the complaint should not be allowed to escape the consequences of the default).

## V.   ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion of plaintiff Edwin B. Mishkin, as SIPA Trustee (the "Trustee") for the liquidation of the business of Adler, Coleman Clearing Corp. ("Adler"), for

summary judgment against defendant Philip Gurian ("Gurian") as a controlling person under the doctrine of alter ego liability and Section 20(a) ("§ 20(a)") of the Securities and Exchange Act of 1934 is GRANTED, and it is further

**ORDERED** that the Clerk of Court enter judgment in favor of the Trustee and against Gurian in an amount of Fifty Million Dollars ($50,000,000.00) as damages suffered by Adler as a result of the statutory and common law securities violations attributable to Gurian as a control person of Roddy DiPrimo, S.A., ("DiPrimo"), provided that the amount the Trustee may recover from Gurian under such judgment shall be reduced by any monies the Trustee has collected from any other person jointly and severally liable to the Trustee for the same losses attributable to the wrongful conduct at issue in this action; and it is finally

**ORDERED** that Gurian, as a control person of DiPrimo is liable under the alter ego doctrine for payment of the obligations of DiPrimo to the Trustee, including the judgment rendered on November 26, 1996 against DiPrimo and in favor of the Trustee in the Bankruptcy Court proceedings brought for the liquidation of Adler, which judgment the Trustee may enforce against Gurian.

**SO ORDERED.**

Dated:      New York, New York
            8 January 2007


                              VICTOR MARRERO
                                U.S.D.J.